66 P.3d 785

STATE of Hawai'i, Plaintiff–Appellee,

v.

Dorothy–Marie FAUFATA, Defendant–Appellant, and David C. Martinez, Defendant.

No. 24630.

Intermediate Court of Appeals of Hawai'i.

March 4, 2003.

Chester M. Kanai, on the briefs, Honolulu, for Defendant–Appellant.

Donn Fudo, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Dorothy–Marie Faufata (Faufata), appeals from the Judgment filed on September 19, 2001, convicting her of the included offense of Manslaughter, Hawai'i Revised Statutes (HRS) § 707–702(1)(a) (1993),[1] and sentencing her to an indeterminate term of imprisonment of ten (10) years

---

1. Hawaii Revised Statutes (HRS) § 707–702 (1993) provides, in relevant part, the following:

(1) A person commits the offense of manslaughter if:

(a) He recklessly causes the death of another person; ...

....

(3) Manslaughter is a class B felony.

and to a mandatory minimum of three (3) years and four (4) months pursuant to HRS § 706–660.2 (1993).[2] We affirm.

## BACKGROUND

On November 23, 1999, a Grand Jury Indictment charged Faufata in Count I, and her co-defendant, David C. Martinez (Martinez), in Count II, of Murder in the Second Degree, HRS §§ 707–701.5,[3] 706–656,[4] and 702–203,[5] for intentionally or knowingly causing the death of Faufata's daughter, Natasha Faufata (Natasha). Natasha was born on February 1, 1992. Natasha died on or before March 21, 1994. The Indictment alleged that Faufata

being the parent of Natasha Faufata, did intentionally or knowingly cause the death of Natasha Faufata, a child less than eighteen (18) [sic] years of age, by failing to seek and obtain timely medical treatment for the injuries Natasha Faufata sustained,

thereby committing the offense of Murder in the Second Degree,.... Defendant is subject to sentencing in accordance with Section 706–660.2 of the Hawai'i Revised Statutes, where, in the course of committing a felony, she caused the death of Natasha Faufata, who was less than eight (8) years of age, and [Faufata] knew or reasonably should have known of such disability.

On July 31, 2000, Martinez filed a "Motion to Dismiss Indictment for Preindictment Delay" (Motion to Dismiss). Faufata joined in the Motion to Dismiss by filing a submission of notice of joinder on August 4, 2000. A hearing was held on November 22, 2000, before Judge Michael A. Town. At that hearing, Martinez stated:

We'd submit there's a presumptive prejudice to the defendant when cases are essentially sat on by the prosecutor who

2. HRS § 706–660.2 (1993) provides, in relevant part, as follows:

Notwithstanding section 706–669, a person who, in the course of committing or attempting to commit a felony, causes the death or inflicts serious or substantial bodily injury upon a person who is:

. . . .

(3) Eight years of age or younger;

and such disability is known or reasonably should be known to the defendant, shall, if not subjected to an extended term of imprisonment pursuant to section 706–662, be sentenced to a mandatory minimum term of imprisonment without possibility of parole as follows:

. . . .

(3) For a class B felony—three years, four months[.]

This statute is worded to include all felonies. It includes situations where a material element of the felony, such as murder or manslaughter, is "causing the death of." It includes situations where "the defendant, in the course of committing a murder, caused the death of." In *State v. Klafta*, 73 Haw. 109, 831 P.2d 512 (1992), the defendant was sentenced for attempted second degree murder of an infant by abandonment resulting in serious bodily injuries to the infant.

3. HRS § 707–701.5 (1993) provides, in relevant part, as follows:

(1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

(2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

4. HRS § 706–656(2) (1993) provides, in relevant part, as follows:

Persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the Hawai'i paroling authority; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment; and provided further that in any cases designated in section 706–657, the person may be sentenced to life imprisonment without possibility of parole.

If the court imposes a sentence of life imprisonment without possibility of parole, as part of such sentence the court shall order the director of public safety and the Hawai'i paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

5. HRS § 702–203 (1993) provides, in relevant part, as follows:

Penal liability may not be based on an omission unaccompanied by action unless:

(1) The omission is expressly made a sufficient basis for penal liability by the law defining the offense; or

(2) A duty to perform the omitted act is otherwise imposed by law.

five and a half years prior to the case being brought or conferred to the Oahu Grand Jury[,] the prosecution, . . . [was] acutely aware of the factual circumstances surrounding the allegations against Mr. Martinez and Ms. Faufata at the time.

Echoing the same sentiments, Faufata argued that

the delay itself, the five years eight months, is presumptively prejudicial. . . .

[A]nd if you take a look at the memo of the State which gives an explanation and it is really an insufficient explanation for the delay given the seriousness of the offense, then the court must conclude that the delay was prejudicial.

To explain the delay, Plaintiff–Appellee State of Hawai'i (State) in its August 23, 2000 memorandum in opposition to the Motion to Dismiss (August 23, 2000 Memorandum) said that

[t]he reason for the delay . . . is that neither the Deputy Prosecutor who was originally assigned the case, nor the two other Deputy Prosecutors, subsequently assigned, were satisfied that the police and the medical examiner investigations were able to adequately determine the mechanism of the child's death; thus, the manner of death in the autopsy report was classified as "undetermined." . . . .

It was not until the spring of 1998, when the new administration initiated a department review of old child death cases, that the resources were allocated to consult with Dr. Janice Ophoven, M.D., a mainland expert, qualified as a pediatric forensic pathologist; a subspecialty in pathology not available in Hawai'i. After consultation, Dr. Ophoven submitted her report, . . . wherein she concluded that the victim, Natasha Faufata, died as a result of "homicidal assault."

In its August 23, 2000 Memorandum, the State also argued that

Defendants must show actual prejudice in order to prove that they are entitled to a dismissal of charges. General statements that Defendants "may" be negatively impacted by such things as a loss of memory coupled with a lapse of time does not, of itself, establish prejudice for purposes of a claim of violation of due process under Article I, Section 5 of the Hawai'i State Constitution. (Citations omitted).

At the November 22, 2000 hearing, the State repeated its argument that "the case law is again that . . . clearly the first prong is they have to establish actual prejudice, and the State submits that there's been no presentation of any evidence to indicate any actual prejudice to the defendants."

At the November 22, 2000 hearing, the defense admitted it was cognizant of the case law in Hawai'i that seemed to require a showing of prejudice, but said it was difficult to show any prejudice at that point in the proceedings.

On March 22, 2001, Judge Town issued an order denying the Motion to Dismiss.

On May 15, 2001, Faufata and Martinez waived their right to a jury trial. On that date, the State filed a motion in limine to "allow at trial the introduction of evidence of prior injuries to the baby-decedent . . . as the factual basis for expert medical testimony on the issue of Battered–Child Syndrome" (BCS Motion). On May 18, 2001, a hearing was held on the BCS Motion and the transcript of that proceeding, in relevant part, reads as follows:

THE COURT: . . . I'm well aware of the battered child syndrome concept. Other states have allowed it, historically. Is there any case on all fours in Hawai'i?

[DEPUTY PROSECUTING ATTORNEY (DPA)]: No, Your Honor. As far as I know, it hasn't been litigated in Hawai'i yet, but that's why I didn't cite in the specific Hawai'i authority. But as my memo points out, for the record, that real long string cite that I put in there, I mean, it's—it's well settled both in the federal courts all the way up to the Supreme Court and in various state jurisdictions around the country, . . . .

THE COURT: I know I've let it in in family court and noncriminal matters, civil matters, i.e. child protection, but I was frankly unaware that there was a problem. May be foundational in nature.

In your mind, you can proffer a proper foundation through the doctor; is that correct?

[DPA]: That's correct, Your Honor. This is all contingent upon calling the expert who in this case is Dr. Victoria Schneider. She's the child abuse expert down at Kapiolani....

. . . .

THE COURT: ... [Defense counsel], how do you want to handle this?

[DEFENSE COUNSEL]: Let me first start by—by saying that under the original charge, there's a specified period on the causation of death, and I think it's, roughly speaking, a few days. It does not run months, it does not run years.

Number two, there are specific injuries found on the child on a certain date. Now, I think the extent of the so-called prior injuries should be limited to that found on the child and any, you know, extrapolated testimony taking that—taking those injuries to somehow determine that this child was a battered child, and then to stretch from there to say that this battering caused her death, I think is too much of a leap. I think the facts show that on a specific date there was choking and gagging and she was brought down to the fire station.

What I'm saying is the battered child syndrome plays, I think, a limited role and certainly a—an irrelevant and immaterial role to this case. So to have an expert to come in and testify—testify as to the specific injuries found and what it means in terms of her death, fine, but to go into the general subject matter of battered child syndrome now, in this case, I think is not proper. ,

. . . .

THE COURT: ... [S]ubject to foundation by Dr.—by the state and Dr. Schneider, I'll respectfully grant this motion, particularly with a nonjury setting. To me, lack of accident is important[.]

On May 23, 2001, Judge Town entered an order granting the BCS Motion.

Trial began on May 23, 2001, and the State presented its case. The State called Andy Verke (Verke), a Honolulu firefighter. Verke testified that on March 18, 1994, he was working at the Palolo Fire Station around 4:45 p.m. "when a vehicle pulled into the rear of the fire station." Verke said he heard someone yelling "help my baby" and responded by opening the rear door to the station. According to Verke, when the door was raised, a man ducked inside with a baby in his arms which he handed to Verke. Verke stated that the man who handed him the baby told him that the baby "was eating a doughnut, and then, she choked"; however, when Verke inspected the baby's mouth and airway, he did not see any food particles. As he held the baby, Verke noticed that "she was soaking wet," "extremely cold," and "purplish—face, eyes, lips." After checking and finding that the baby was not breathing, Verke began artificial respirations. Immediately thereafter, he checked for a pulse, could not find one, and began cardiopulmonary resuscitation (CPR). Verke continued CPR until the ambulance personnel arrived and took over.

The State called Dr. Paula Vanderford, who is licensed and certified in pediatrics and pediatric critical care and the Medical Director of the Pediatric Intensive Care Unit (PICU) at Kapiolani Medical Center (KMC). Dr. Vanderford was the attending physician when Natasha was brought to the PICU at around 6:40 p.m., March 18, 1994. Referring to a series of photographs taken after Natasha was admitted to the PICU, Dr. Vanderford testified that Natasha had "a small laceration above her left eye," "[a] small bruise or abrasion on her right cheek," "[d]iscreet bruises on the forehead, as well as on the left temporal region," "[a] circular burn on her left palm," "[b]urns ... distal to her left elbow," "[s]ome superficial abrasions on the upper abdomen," "[r]ight lower abdomen ... linear abrasions," "[b]ruises in the lower thoracic lumbar spine," "[s]uperficial abrasions of the right knee and the right shin," and "[t]wo scars, circular, approximately 1/8 centimeters in diameter—two on her right foot, and one on her left." According to Dr. Vanderford, Natasha was "brain dead" when admitted. Dr. Vanderford concluded that "a

prolonged period of time [had passed] before [Natasha was] brought to medical attention."

On cross-examination, defense counsel elicited the following testimony:

Q: ... Now, you testified that in your opinion, the mechanism of injury in this particular case, the brain swelling, the mechanism of injury might have occurred several hours prior to Natasha being brought into the emergency room at Kapiolani Hospital; do you remember saying that?

A: Yes.

. . . .

Q: ... And to you, several hours means what—a couple of hours, two?

A: Two to three hours.

On redirect, the DPA elicited the following response:

Q: ... Would you expect a soft thing such as a doughnut to completely occlude a child's airway?

A: Not if they have normal cough and gag.

Q: In other words, if they still had their natural reflexes, you don't expect a doughnut, a soft item like a doughnut to completely block the airway, right?

A: No.

On recross, Dr. Vanderford admitted soft food could cause a choking episode.

The State called Dr. Robert DiMauro, a pediatric radiologist and Director of Diagnostic Imaging at KMC. On direct examination, Dr. DiMauro testified, in relevant part, as follows:

Q: ... Doctor, given the extent and the nature of the brain edema that you've just described to the Court, and given that the CT scan was taken at 6:13 in the evening of March 18, 1994, how much prior to the taking of the scan did the ultimately fatal cut-off of oxygen to the child's brain occur? . . . .

. . . .

A: Yes, it was some period of time. I would state that it would be between six and 24 hours.

. . . .

Q: Okay. Now, do you have an opinion, if you were able to render one, as to whether in your opinion it is more likely that the ultimately fatal incident, the cut-off of oxygen to this child's brain, occurred closer to the six-hour minimum or to the 24–hour maximum?

A: Closer to the 24–hour maximum.

On June 4, 2001, the State called Dr. Alson S. Inaba, a board-certified pediatrician in pediatric emergency medicine. Dr. Inaba was the attending physician in charge of the KMC's emergency room on March 18 when Natasha was admitted. Dr. Inaba testified, in relevant part, as follows:

Q: ... Once she [was] actually presented at the E.R., what was her condition?

A: Her condition was in what we consider a full cardiopulmonary arrest, meaning no spontaneous breathing, no heart beat, no [rhythm].

. . . .

Q: What was her core temperature?

A: Her core temperature, upon review of the Code Blue Sheet, was 85 point—I'm not sure what the point was. 85.7, 85.4.

. . . .

Q: ... What's your opinion as to what was causing [Natasha's] incredibly low pH number and the metabolic acidosis, et cetera?

A: Based on the history that was given of a perfectly healthy child who was choking, that didn't fit with her clinical condition and it didn't fit the numbers that we had obtained. So for someone who was in cardiopulmonary arrest, then I had to begin to wonder, "Just how long a period of time was she really in cardiopulmonary arrest?"

On cross-examination, defense counsel elicited the following response:

Q: From the time her heart stopped beating up until the time she was admitted into the emergency room, what would you—what would you best estimate the time period to be?

. . . .

A: Probably say at least a couple hours.

Q: A couple of hours.

A: To even more.

Q: To even more. I see.

And "to even more," you would stretch it out to, what, the eight-, ten-hour range?

. . . .

A: —patients who come in in that situation, yeah, maybe six hours.

The State called Dr. Victoria Schneider, Medical Director of the Kapiolani Child Protection Center. After overruling the objections of defense counsel, the court allowed Dr. Schneider to provide a brief, general description of the "battered child syndrome." In essence, she described it as "a child presenting with a variety of different types of injuries that, when put together, cannot be reasonably described by another mechanism aside from child abuse." She then specifically discussed her assessment of the medical records of Natasha:

Q: Okay. Doctor, you detailed all of the injuries and have gone over them again with the Court.

In your expert medical opinion, to a reasonable degree of medical certainty, were all of the injuries that you have detailed and described inflicted by someone on Natasha Faufata?

. . . .

A: Well, Natasha presented with a series of different injuries—injuries consistent with burns, injuries consistent with blows to the skin which resulted in the bruises and the abrasions, and a fracture of a bone. And so these are a serious and unique combination of injuries that had no unique accidental trauma to explain them.

And so when we see one type of injury, we think, "Well, maybe that could have happened accidentally." But we see two different types of injuries occurring together, the possibility of them both occurring by two separate mechanisms becomes very unlikely. And when you add a third type of injury in, you're really, to a degree of medical certainty, certain that these are inflicted injuries.

I think this is why the battered child syndrome diagnosis was created, to describe these children with this kind of unique combination of types of injuries occurring at the same time without reasonable alternative explanations.

Q: And in this case, you've got at least bruising and abrasion, burns, and the bone fracture?

A: That's correct.

Q: Okay. So in your expert medical opinion, these were not accidental injuries?

A: That's correct. The other part of that is the injuries of at least two different categories of ages because we know that the fracture is seven to ten days old and we know that the lesions on the hand and on the arm and on the—the two on the hand and the arm and the bruises and the abrasions are fresher than that. So we know that things happened to Natasha at least on more than one occasion.

Q: In your expert medical opinion, to a reasonable degree of medical certainty, based on everything you've told the Court so far, was Natasha Faufata a battered child?

A: Yes, she was in my opinion.

. . . .

THE COURT: Doctor, what significance do you place on the five different burns which may or may not be in different stages of healing? I understand cuts and bruises and I understand broken bones. The burns seem to me to be very significant. Are they just another factor or are they major factor or minimal?

THE WITNESS: Well, you know, those burns hurt. They cause a lot of pain. The child would be very symptomatic. And they're in places on the body which are concerning like the soles of the feet that—where children don't accidentally, you know, get burned.

THE COURT: So what significance—

THE WITNESS: I think that they're very significant because, number one, no medical care was sought and, number two, the fact that they're there and of different ages implies that the child was—was injured and no medical care was sought and

that that child was in pain for some amount of time before coming into the hospital.

On June 5, 2001, Lieutenant Kenneth Ikehara (Detective Ikehara) of the Honolulu Police Department, lead detective in the investigation of Natasha's death, testified about the two audio-taped interviews he conducted with Faufata. Following Detective Ikehara's identification of Faufata as the source of the statements, Judge Town silently read the transcripts of Faufata's statements while listening to the tapes of the Saturday, April 2, 1994, and Sunday, April 3, 1994 interviews of Faufata.

In the April 2, 1994 interview, Faufata waived her right to counsel and stated that she was the mother of Natasha and had custody of her "since she was born." Faufata also stated that Martinez was her boyfriend. When asked whether she had noticed any injuries to Natasha, she said Natasha was injured when she fell off a "three wheeler bike" while trying to ride it down a hill. She also said Natasha had a bump on her head from falling off the bed while sleeping at Martinez's house and a limp from falling down the steps at Faufata's mother's house. Faufata stated that she discovered burn marks on Natasha's arm and hand while bathing her. When she asked Martinez about them, Martinez denied knowledge of the burns. Faufata stated that Natasha was with friends when the burns occurred.

During the April 2, 1994 interview, Faufata stated that on March 18, "between three and four, around there," she fed Natasha "[a]nd then David came up and he said he was going to take—he was going to take baby[.]" Later that same afternoon, Faufata said the following occurred:

[A]ll of a sudden I just hear David's voice and then, where's Dorothy, where's Dorothy? And I said, I went, yeah. He goes, come on, let's go. And I said, go where? And he goes, Tasha, Tasha stay down the fire station. And I went, what? . . . .

[David] said that she was, um, like gagging or like she—white stuffs started coming out of her nose.

On Sunday, April 3, 1994, a second interview was held at Faufata's request to allow her to change what she had initially told Detective Ikehara. After waiving her Miranda rights, Faufata proceeded to talk "about the burns." She stated that Martinez admitted to burning Natasha's right forearm twice with a cigarette and that, although he claimed it was an accident, she was suspicious. Prompted by Detective Ikehara, she recanted her statement that Natasha was staying with friends when burned.

At this second interview, Faufata also told Detective Ikehara that Natasha was afraid of Martinez and had been for a period of two to three months and that Natasha started getting hurt in January of 1994, about one month after she (Faufata) started seeing Martinez.

When asked about Natasha's recent injuries, Faufata responded that Martinez told her that Natasha fell off the bed onto the asphalt floor of his bedroom on the Wednesday afternoon before her death. Faufata stated that Natasha fell asleep shortly after the fall, but that when she found out about the fall, she woke Natasha because she had learned from TV that if a baby falls asleep after a bump on the head, "she might not get up." Faufata stated that Natasha remained "drowsy" after the fall and that she knew something was wrong. Faufata also stated that Natasha fell "off the bike three times" that same Wednesday afternoon. When asked why she did not seek help, Faufata said that Natasha was eating normally and did not have a fever, but later admitted she was afraid to take Natasha to the doctor because "they going suspect it's abuse."

On the subject of abuse, Faufata further testified, in relevant part, as follows:

Q Did David tell you not to take her?

A No. It was my, you know . . . I was afraid because the bruise and the cig, you know, the cigarette. I thought they going blame me for me doing that and I didn't even do it. But with, you know, with her head, I knew it was serious, but I figured if by the lump going down and by keeping her up and active, you know, and watching . . .

Q  Yeah, but you was watching for like from Wednesday night to Friday, right? And she wasn't getting better. She was getting worse, probably, right?

A  Yeah. She wasn't herself.

. . . .

Q  —that's what the experts telling us, that the baby would be getting worse and worse.

A  She was—looked to the point she was getting worse, but by her eating, I was thinking nothing was wrong.

Q  No, but you know, if you—you saying you were scared to take her, because they would suspect abuse. But she was getting worse and worse. You should have just taken her.

A  Taken her. I should have. Maybe she would have been here.

On June 6, 2001, Dr. Janice Ophoven, a board-certified pediatric forensic pathologist, testified that in her opinion, Natasha was a "victim of battered child's syndrome." She went on to say that "[t]he child had evidence of healed and healing and fresh injuries that were inconsistent with the kinds of injuries that occur to an otherwise active two-year-old child and are consistent with inflicted injuries from another." Furthermore, she stated, "It's my opinion that Natasha most certainly was in dire medical condition for hours, if not many hours, before she was presented to the fire department. And by "dire condition," I mean that to anyone's view, she desperately needed medical attention, most probably was unconscious or semi-conscious."

On cross-examination, Dr. Ophoven acknowledged the opinion letter she had written on March 11, 1999, stating that there was a history of diligent regular care by Natasha's mother and that she brought the child to her physician for regular checkups and immunization shots.

The State's final witness was Dr. Robert D. Bart, Jr. (Dr. Bart), a board-certified pediatric neurologist. Dr. Bart testified, in relevant part, as follows:

Q.  —how much prior to the taking of the CT scan [at approximately 6:00] did

the ultimately fatal cutoff of oxygen to the child's brain that you just talked about occur?

. . . .

A.  Six to twelve hours.

. . . .

Q. . . . . Now, in your expert medical opinion, what would have been the child's condition after suffering the ultimately fatal cutoff of oxygen to her brain?

A.  She would be unconscious, comatose.

On cross-examination, Dr. Bart testified, in relevant part, as follows:

Q. . . . . [A]re you saying you really can't render an opinion as to just how the oxygen might have been cut off in the Natasha case?

A.  No, I said that I felt she was suffocated.

. . . .

Q. . . . .

And in your opinion, then, I take it that this was not self-inflicted, this suffocation; it had to be done by some third party?

A.  Yes.

On June 8, 2001, the defense called its first witness, Adam Kaiwi, Jr. (Kaiwi). He testified that Natasha was awake, talking, and playing the afternoon of March 18, 1994, and that she was not upset when held by Martinez. Kaiwi also testified that later in the afternoon, after he returned from a quick trip to a nearby store, he came upon an agitated Martinez who told him Natasha was choking. Kaiwi claimed he (Kaiwi) pulled a piece of doughnut from Natasha's mouth and tried to give her CPR but she did not respond, so they (Kaiwi and Martinez) took her to the fire station. During cross-examination, Kaiwi admitted he thought something was wrong with Natasha when he first saw her that day, but later said he thought it was only a "stiff neck."

Martinez's son, Kealoha Martinez, also testified on June 8, 2001. He testified that Martinez was a good father and that Natasha was awake, playing, and appeared fine the afternoon of March 18, 1994.

On June 12, 2001, Dr. Kanthi von Guenther, Chief Medical Examiner for the City and County of Honolulu and board-certified in forensic pathology, testified that she could not determine the proximate cause of death. She stated that "there was evidence of choking," but that she could not make a determination without further information. Dr. von Guenther found it difficult to believe Natasha's temperature was around 85 degrees, thought human error likely, and said that a temperature of 95 degrees was possible for a girl who had been in cardiac arrest. She stated that because of the cigarette burns on the soles of Natasha's feet, left elbow, left palm, and left fifth finger, she suspected child abuse. She also stated that she did not find evidence of suffocation. Dr. von Guenther also testified that Natasha could have suffered her fatal injury anywhere from two to eighteen hours before the CAT Scan was done. On June 15, 2001, Stacia Scanlan testified that she had known Martinez for a long time, that he was good with children, and that Natasha loved him. She said that on the afternoon of March 18, 1994, she observed Natasha and that Natasha was playing and looked fine.

Hildegard Barona testified that she had known Martinez for a long time and that on March 18, 1994, she had taken her car to where Martinez was living to have him work on it. She said Natasha was walking, happy, and playful that afternoon.

John Aipia, a long-time acquaintance of Martinez, testified that Martinez was good with children, that children liked Martinez, and that he had observed no problems when Martinez was with Natasha.

Arva Lewis testified that on March 18, 1994, she went with Hildegard Barona to the Martinez's house to get Barona's car fixed. She stated that when she first saw Natasha, Natasha was playing, but that later, Natasha fell asleep on the swing. She said that while Natasha was awake, she was happy and "couldn't keep still."

Laverne Chong testified that she had known Martinez for a long time, that he was the father of her two sons, and that he was a good dad.

On June 18, 2001, Dr. John M. Hardman, a physician board-certified in anatomic and clinical pathology and neuropathology, testified that the fact that Natasha was resuscitated indicated she got into trouble fairly soon before she arrived at the emergency room. Dr. Hardman stated that "there is proof that she probably did aspirate something sometime and it could certainly fit that story [that Natasha choked on a doughnut]." Dr. Hardman also said, that after reviewing the medical records, the findings were consistent with a hypoxic injury due to choking.

Cross-examination of Dr. Hardman elicited an admission that the hypoxic injury to Natasha could have occurred several hours prior to her arrival at the emergency room.

Dr. Anthony Manoukian testified on June 18, 2001, and he was the last witness for the defense. Board-certified in anatomic and clinical pathology and forensic pathology, Dr. Manoukian testified that he found no evidence that Natasha was suffocated and that there was nothing inconsistent between Martinez's account of what happened and the findings of the autopsy report.

Closing arguments were heard on June 22, 2001. On July 13, 2001, Judge Town entered his Decision, in relevant part, as follows:

While this Court finds Natasha's injury was inflicted, this court cannot find beyond a reasonable doubt that the evidence supports a murder by commission conviction as there is insufficient evidence as to who specifically suffocated the child given the rather large number of people who had access to Natasha that day during the relevant time frames from 3:00 PM or earlier. Further there is reasonable doubt given the facts and circumstances that Defendants committed the crime of Murder by omission such that they intentionally or knowingly caused her death by failing to seek and obtain timely medical attention.

There is, however, proof beyond a reasonable doubt that both Defendants' failure to seek and obtain medical care constituted the included offense of Manslaughter in that Natasha's injury was inflicted, both defendants were present at the time of the injury, and knew of the injury. The evidence shows beyond a reasonable doubt

that Defendants Martinez and Faufata recklessly caused the [sic] Natasha's death by consciously disregarding a substantial risk of her death by not seeking and providing timely medical attention.... A duty of care was imposed upon both Defendant Martinez and Defendant Faufata to seek and obtain timely medical care under the relevant statutes (HRS section 663–1.6) and case law ... as set forth by the State in its thorough and persuasive briefing of this matter.

On September 19, 2001, Judge Town sentenced Faufata to ten years of imprisonment and to a mandatory minimum of three years and four months pursuant to HRS § 706–660.2.

## POINTS OF ERROR ON APPEAL

Faufata asserts the following three points on appeal:

The trial court erred when it failed to elucidate on the record, the balancing approach's outcome in determining prejudice to the defendant's right to [a] fair trial against the reasons for the delay. The record is devoid of any due process inquiry into presumptive prejudice, the reason for delay and any prejudice to the defendant. See *State v. English*, 61 Haw. 12, 594 P.2d 1069 (1979); *State v. Carvalho*, 79 Hawai'i 165, 880 P.2d 217 (1994).

. . . .

The trial court erred by allowing in as evidence the testimony by Dr. Victoria Schneider concerning the broad subject matter of Battered Child Syndrome.

. . . .

The trial court committed error when it found Appellant Faufata guilty of reckless manslaughter by omission because there is no such lesser included offense to murder in the second degree by omission offense and/or there is a lack of [a] rational basis in the evidence to conclude that Appellant Faufata could be guilty of reckless manslaughter by omission.

## STANDARDS OF REVIEW

### Constitutional Issue

We review questions of constitutional law "by exercising our own independent constitutional judgment based on the facts of the case." *State v. Rogan*, 91 Hawai'i 405, 411, 984 P.2d 1231, 1237 (1999) (citations omitted). Therefore, we review questions of constitutional law *de novo* under the "right/wrong" standard. *State v. Mallan*, 86 Hawai'i 440, 443, 950 P.2d 178, 181 (1998) (citation omitted, emphasis added); *State v. Furutani*, 76 Hawai'i 172, 873 P.2d 51 (1994) (a lower court's determination that defendants' constitutional right to a speedy trial was not violated is a conclusion of law reviewed *de novo*).

### Evidentiary Issues

"We apply two different standards of review in addressing evidentiary issues. Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." *State v. Ortiz*, 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999) (citations and some quotations omitted).

### Questions of Law

Questions of law are freely reviewed upon appeal under a right/wrong standard of review. *Maile Sky v. City and County of Honolulu*, 85 Hawai'i 36, 39, 936 P.2d 672, 675 (1997).

## DISCUSSION

### Preindictment Delay

The indictment filed on November 23, 1999, alleged, in relevant part, that Faufata "[o]n or about the 16th day of March, 1994, to and including the 21st day of March, 1994, ... did intentionally or knowingly cause the death of Natasha Faufata[.]" In deciding a motion for a dismissal because of preindictment delay,

we "follow the balancing approach adopted by a substantial number of courts in other jurisdictions" by weighing "substantial prejudice to the defendant's right to a fair trial" against "the reasons for the delay in

determining whether dismissal of the criminal charge is required." *State v. English*, 61 Haw. 12, 17 n. 8, 17, 18, 594 P.2d 1069, 1073 n. 8, 1073 (1979).

*State v. Carvalho*, 79 Hawai'i 165, 167, 880 P.2d 217, 220 (App.1994). In other words, if and when the defendant satisfies his or her burden of proving substantial prejudice to his or her right to a fair trial, the reason(s) for the prosecutorial delay is (are) then decided [6] and the weight of the former is balanced against the weight of the latter. *Id.* at 170, 880 P.2d at 222; [7] *State v. Crail*, 97 Hawai'i 170, 35 P.3d 197 (2001).

In *Carvalho*, the defendant was not indicted until almost a year after the police handed the case over to the prosecutors. *Carvalho*, 79 Hawai'i at 168, 880 P.2d at 220. Carvalho argued that due to the delay, he could not recall the events of the day of the alleged incident and that prevented him from identifying alibi witnesses. *Id.* Responding to his claim that he was "prejudiced by the loss of potential alibi witnesses[,]" this court said that "in a claim of pre-indictment delay, 'the proof must be definite and not speculative' in order to establish prejudice." *Id.* at 169, 880 P.2d at 221 (quoting *State v. Broughton*, 156 Ariz. 394, 398, 752 P.2d 483, 487 (1988)).

In court, Faufata argued that the delay from March 21, 1994, to November 23, 1999, "may negatively impact [her] ability to interview, locate, and secure witnesses." At the November 22, 2000 hearing, Faufata mentioned Rodney Sonoda (Sonoda), a witness who had passed away, but then admitted that Sonoda appeared not to have evidence pertinent to the case. At trial, Faufata and Martinez were tried together, their defense counsel called ten witnesses, including five who stated they were at Martinez's residence the afternoon of March 18, 1994. Eight of the ten witnesses offered testimony helpful to Faufata's defense. Faufata failed to establish any prejudice to her right to a fair trial.

### Admissibility of Dr. Schneider's Testimony

■ Hawai'i defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Hawai'i Rules of Evidence (HRE), Rule 401 (1993). In Hawai'i, "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawai'i, by statute, by [the HRE], or by other rules adopted by the [Hawai'i] supreme court[.]" HRE Rule 402. HRE Rule 403 [8] provides several of the exceptions alluded to by HRE 402.

The Hawai'i Supreme Court has said that "the determination of the admissibility of relevant evidence under HRE 403 is eminently suited to the trial court's exercise of its discretion because it requires a cost-benefit calculus and a delicate balance between probative value and prejudicial effect." *Sato v. Tawata*, 79 Hawai'i 14, 19, 897 P.2d 941, 946 (1995) (citations, internal quotation marks, and brackets omitted). Moreover, the court

6. According to Plaintiff–Appellee State of Hawai'i (State), the reason for the more than five-year delay was that the police and the medical examiner were unable to adequately determine the mechanism of the child's death until the spring of 1998 when resources were allocated to hire Dr. Janice Ophoven, a Minnesota, board-certified expert in pediatric forensic pathology, a sub-specialty of pathology not available in Hawai'i. The State maintained that only after Dr. Ophoven submitted her report concluding that Natasha Faufata died as a result of "homicidal assault" was there sufficient evidence to indict Faufata. The State did not explain why the resources were not allocated sooner.

7. It would appear that the reason(s) for the prosecutorial delay would have to be quite significant to outweigh proof that the delay caused substantial prejudice to defendant's right to a fair trial.

Massachusetts avoids this issue with the following rule: "In order to be entitled to dismissal of the indictment due to preindictment delay, the defendant must demonstrate that he suffered substantial actual prejudice to his defense, and that the delay was intentionally or recklessly caused by the government." *Commonwealth v. George*, 430 Mass. 276, 281, 717 N.E.2d 1285, 1289 (1999).

8. Hawai'i Rules of Evidence Rule 403 (1993) reads as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

has said that in a jury-waived trial, the judge is entitled to "considerably greater discretion" in hearing evidentiary motions because there is no possibility of jury bias. *State v. Sprattling,* 99 Hawai'i 312, 322–23, 55 P.3d 276, 286–87 (2002) (citation omitted).

The United States Supreme Court has said that

> evidence demonstrating battered child syndrome helps to prove that the child died at the hands of another and not by falling off a couch, for example; it also tends to establish that the 'other,' whoever it may be, inflicted the injuries intentionally. When offered to show that certain injuries are a product of child abuse, rather than accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who might have inflicted those injuries.

*Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385, 396 (1991) (citations omitted). The Court noted that "California law allows the prosecution to introduce expert testimony and evidence related to prior injuries in order to prove 'battered child syndrome.'" *Id.* (citing *People v. Bledsoe,* 36 Cal.3d 236, 249, 203 Cal.Rptr. 450, 458, 681 P.2d 291, 299 (1984); *Landeros v. Flood,* 17 Cal.3d 399, 409, 131 Cal.Rptr. 69, 73, 551 P.2d 389, 393 (1976); *People v. Jackson,* 18 Cal.App.3d 504, 506–08, 95 Cal.Rptr. 919, 921–22 (1971)).

Several other state courts permit the use of expert testimony on battered child syndrome and for child sexual abuse cases. See, e.g., *State v. Butterfield,* 128 Or.App. 1, 10–12, 874 P.2d 1339, 1345–46, *reh'g. den.,* 319 Or. 625, 879 P.2d 1287 (1994) (allowing experts to testify on battered child syndrome as long as the testimony does not comment on the credibility of other witnesses); *State v. Janes,* 121 Wash.2d 220, 235, 850 P.2d 495, 502 (1993) ("Given the close relationship between the battered woman and battered child syndromes, the same reasons that justify admission of the former apply with equal force to the latter."); *State v. Morgan,* 291 Mont. 347, 354, 968 P.2d 1120, 1124 (1998) (allowing use of expert testimony to explain the complexities of child sexual abuse); *State v. Lujan,* 192 Ariz. 448, 452, 967 P.2d 123, 127

(1998) (citing *State v. Moran,* 151 Ariz. 378, 384, 728 P.2d 248, 254 (1986) ("When the facts of the case raise questions of credibility or accuracy that might not be explained by experiences common to jurors—like the reactions of child victims of sexual abuse—expert testimony on the general behavioral characteristics of such victims should be admitted.")).

While it appears that most states do allow expert testimony in this area, some states do not. Compare *Kolberg v. State,* 829 So.2d 29, 70–71 (Miss.2002) (recognizing diagnoses of abuse in the context of specific facts but not abuse syndromes). Faufata was charged with Murder in the Second Degree. To prove that offense, it was the State's burden to prove beyond a reasonable doubt that Faufata "intentionally or knowingly cause[d] the death of another person." See HRS § 707–701.5. Dr. Schneider's testimony on the battered child syndrome was relevant to prove that the injuries to Natasha were not accidental and that someone must have intended to harm Natasha. The court did not abuse its discretion in admitting the testimony. The fact that Faufata was convicted of Manslaughter does not invalidate the court's prior ruling.

Manslaughter As An Included Offense

■ Faufata was charged with intentionally or knowingly causing the death of Faufata's daughter, Natasha. Faufata was convicted of recklessly causing the death of Natasha. As noted in HRS § 702–206(3)(c) (1993), "[a] person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result."

HRS § 702–203 provides that "penal liability may not be based on an omission unaccompanied by action unless: (1)[t]he omission is expressly made a sufficient basis for penal liability by the law defining the offense; or (2)[a] duty to perform the omitted act is otherwise imposed by law." HRS § 702–203. Faufata was the natural mother of Natasha. She had a duty to provide her child with needed medical care. See *State v. Tucker,* 10 Haw.App. 73, 83–84, 861 P.2d 37, 44 (1993)

(failing to perform her duty as a parent to provide her child with needed medical care justified the trial court's instruction on accomplice liability); *State v. Batson*, 73 Haw. 236, 251 n. 8, 831 P.2d 924, 932–33 n. 8 (1992) (noting that HRS § 577-7(a)[9] (1985) imposes on parents a duty to provide support to their children to the best of their abilities and that "[s]uch support includes reasonably necessary and available medical services") (citation omitted, footnote added).

■ HRS § 701-109 provides that "[a] defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when: (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]" HRS § 701-109(4)(a) (1993). "Manslaughter as defined by section 707-702(1)(a) unquestionably is a lesser included offense of murder since one cannot commit murder without also having committed manslaughter." *State v. Holbron*, 80 Hawai'i 27, 42, 904 P.2d 912, 927 (1996).

As noted in HRS § 702-206(3)(c) (1993), "[a] person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result." Judge Town found that "[t]he evidence shows beyond a reasonable doubt that defendants Martinez and Faufata recklessly caused the [sic] Natasha's death by consciously disregarding a substantial risk of her death by not seeking and providing timely medical attention." Faufata responds that "[i]t is illogical to expect an accused to have a reckless state of mind wherein he/she consciously or intentionally disregards seeking help. How can one recklessly decide to intentionally disregard seeking or providing timely medical assistance?" It appears that Faufata's argument is based on her counsel's erroneous understanding that "consciously" means "intentionally."

## CONCLUSION

Accordingly, we affirm the Judgment filed September 19, 2001.

■

---

**9.** HRS § 577-7(a) (1993) provides, in relevant part, as follows:

> Parents or, in case they are both deceased, guardians, legally appointed, shall have control over the conduct and education of their minor children. They shall have the right, at all times, to recover the physical custody of their children by habeas corpus. All parents and guardians shall provide, to the best of their abilities, for the discipline, support, and education of their children.