68 P.3d 606

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**David C. MARTINEZ, Defendant–Appellant.**

No. 24993.

Supreme Court of Hawai'i.

April 30, 2003.

James S. Tabe, Deputy Public Defender, for defendant-appellant.

Donn Fudo, Deputy Prosecuting Attorney, for plaintiff-appellee.

MOON, C.J., LEVINSON and NAKAYAMA, JJ., Circuit Judge ALM, in place of ACOBA J., who is unavailable, and Circuit Judge SAKAMOTO, assigned by reason of vacancy.

Opinion of the Court by LEVINSON, J.

The defendant-appellant David C. Martinez appeals from the judgment of the first circuit court, the Honorable Michael A. Town presiding, adjudging him guilty of manslaughter, in violation of Hawai‘i Revised Statutes (HRS) § 707–702(1)(a) (1993),[1] and sentencing him to ten years of imprisonment, subject to a mandatory minimum prison term of three years and four months. Martinez urges this court to reverse his conviction on the following bases: (1) that the prosecution

---

1. HRS § 707–702(1)(a) provides in relevant part that "[a] person commits the offense of manslaughter if . . . [h]e [or she] recklessly causes the death of another person[.]" "A person acts recklessly with respect to a result of his [or her] conduct when he [or she] consciously disregards a substantial and unjustifiable risk that his [or her] conduct will cause such a result." HRS § 702–206(3) (1993).

adduced insufficient evidence to prove that he committed the offense of manslaughter by omission, in violation of HRS §§ 707–702–(1)(a), *see supra* note 1, 702–203(2) (1993),[2] and 663–1.6(a) (1993);[3] (2) that the circuit court plainly erred in admitting expert testimony that the victim of the crime, the two-year-old child of Martinez's girlfriend, suffered from battered child syndrome (BCS); and (3) that the circuit court erred in denying his motion to dismiss his indictment for preindictment delay.

For the reasons discussed *infra* in Section III, we believe that Martinez's arguments are without merit. Accordingly, we affirm the circuit court's judgment.

## I. BACKGROUND

On November 23, 1999, an Oʻahu grand jury returned an indictment charging Martinez and Dorothy–Marie Faufata [hereinafter, "Faufata"] each with one count of murder in the second degree, in violation of HRS §§ 707–701.5 (1993)[4] and 702–203, *see supra* note 2, in connection with the death of Natasha Faufata [hereinafter, "Natasha"], Faufata's two-year-old child, during the period between March 16, 1994 and March 21, 1994.[5] On July 31, 2000, Martinez filed a motion to dismiss the indictment, in which he argued that the preindictment delay of five years and eight months violated his right to due process of law under Article I, sections 5, 8, and 14 of the Hawaiʻi Constitution and the fifth and fourteenth amendments to the United States Constitution.[6] In his memorandum in support of his motion, Martinez asserted that "the delay ... *may* negatively impact his ability to interview, locate, and secure witnesses on his behalf." (Emphasis added.) Martinez did not draw the court's attention to any specific prejudice by virtue of the delay,[7] however, other than to allege that he would not have pled no contest in an unrelated case if he had known that the prosecution would subsequently file charges in the present matter. Indeed, during the hearing on his motion subsequently conducted on November 22, 2000 by Judge Town, defense counsel conceded that "[i]t's difficult at this point for us to show any prejudice."

The prosecution opposed Martinez's motion on the grounds (1) that Martinez had not established any actual and substantial preju-

2. HRS § 702–203(2) provides that "[p]enal liability may not be based on an omission unaccompanied by action unless .... [a] duty to perform the omitted act is otherwise imposed by law."

3. HRS § 663–1.6(a) provides that

[a]ny person at the scene of a crime who knows that a victim of the crime is suffering from serious physical harm shall obtain or attempt to obtain aid from law enforcement or medical personnel if the person can do so without danger or peril to any person. Any person who violates this subsection is guilty of a petty misdemeanor.

4. HRS 707–701.5(1) provides in relevant part that "a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

5. ⋅ Specifically, the indictment charged that Martinez

did intentionally or knowingly cause the death of Natasha Faufata, by inflicting physical harm upon her, and/or by failing to seek and obtain timely medical treatment for the injuries Natasha Faufata sustained, thereby committing the offense of Murder in the Second Degree, in violation of Sections 707–701.5, 706–656 and 702–203 of the Hawaiʻi Revised Statutes.

6. Article I, section 5 of the Hawaiʻi Constitution provides in relevant part: "No person shall be deprived of life, liberty or property without due process of law...." Article I, section 8 provides that "[n]o citizen shall be disfranchised, or deprived of any of the rights or privileges secured to other citizens, unless by the law of the land[,]" and article I, section 14 provides, *inter alia*, that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial." Article I, sections 8 and 14 do not appear to be relevant either to Martinez's motion to dismiss or to his present appeal.

The fifth amendment to the United States Constitution provides in relevant part that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law"; the fourteenth amendment provides in relevant part that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law[.]"

7. Despite the fact that Martinez indicated in his memorandum in support of his motion that he planned to file a motion to compel discovery "concomitantly with the instant motion" and speculated that "[a] hearing on the motion to compel discovery may reveal that evidence has been destroyed or witnesses have been lost due to the delay in indicting [him,]", no such evidence or witnesses were ever revealed to the circuit court.

dice caused by the preindictment delay and (2) that the delay was required by the uncertainty regarding the manner of Natasha's death, which not resolved until the prosecution was able to allocate the resources necessary to consult Janice Ophoven, M.D., a pediatric forensic pathologist ("a subspecialty in pathology not available in Hawai'i," according to the prosecution), who had recently traveled to O'ahu in conjunction with her testimony in a trial conducted in the United States District Court for the District of Hawai'i.

On March 22, 2001, the circuit court entered an order denying Martinez's motion to dismiss, in which it found that "the reasons for the delay were appropriate and that no substantial prejudice was suffered by [Martinez] from the delay."

On May 15, 2001, the prosecution moved *in limine*, for leave to introduce expert testimony at trial that Natasha suffered from BCS in order to prove intent, knowledge, opportunity, and that Natasha's death was not the result of an accident. In addition, the prosecution sought to introduce evidence of numerous injuries that Natasha had sustained in the weeks prior to her death as the factual basis for the foregoing expert testimony. On May 18, 2001, after hearing arguments by counsel, the circuit court granted the prosecution's motion over Martinez's objection.

The prosecution adduced the following evidence at Martinez's jury-waived trial, which commenced on May 23, 2001. On March 18, 1994, at approximately 4:45 p.m., Martinez arrived at the Honolulu Fire Department's (HFD) Pālolo Fire Station with Natasha in his arms. HFD Firefighter Andy J. Verke, who took Natasha from Martinez, testified that she was "extremely cold" to the touch, "soaking wet," and "purplish" in color. Martinez stated to Verke that Natasha had choked on a white powdered doughnut, which she had been eating, and had lost consciousness. Verke placed Natasha on a table and checked her mouth and airways for "any food residue or anything blocking her airway," but

neither found any evidence of blockage nor—despite Martinez's assertion in his statement to the police that Natasha had vomited—smelled anything even faintly resembling vomit. Verke attempted mouth-to-mouth resuscitation of Natasha and to revive her using an oxygen mask, but his efforts were unsuccessful.

Shortly thereafter, City and County of Honolulu paramedics transported Natasha to Kapi'olani Medical Center (KMC). Alson Inaba, M.D., a pediatrician board certified in pediatric emergency medicine, testified that he was the attending physician on duty in KMC's emergency room when Natasha was admitted at 5:17 p.m. Dr. Inaba testified that Natasha was in "full cardiopulmonary arrest, meaning no spontaneous breathing, no heart beat, no rhythm," when she arrived at KMC. Emergency room personnel were able to restart Natasha's heart and then performed a series of diagnostic tests. Based on her blood's abnormally low pH level, partial pressure carbonated oxide number (PCO2), and level of bicarbonate, as well as her body's significant dehydration and low temperature,[8] Dr. Inaba opined that "the history that was given of a perfectly healthy child who was choking ... didn't fit with her clinical condition and it didn't fit the numbers that [Dr. Inaba] had obtained." In particular, Dr. Inaba noted that the analysis of Natasha's blood indicated a metabolic acidosis that was inconsistent with a child who had recently suffered cardiopulmonary arrest. Accordingly, in his expert medical opinion, the explanation of Natasha's injury that he had been given was inconsistent with her overall clinical condition and the results of KMC's laboratory tests.

After Natasha's initial diagnosis and treatment, and due to concerns regarding marks observed on her head and face, Dr. Inaba requested that Natasha be given a Computerized Axial Tomography (CAT) scan in order to determine whether there was an intracranial explanation for her condition. Dr.

---

8. Natasha's emergency room medical charts appeared to indicate a body temperature of 85.4 degrees Fahrenheit upon admission, but the circuit court found that her body temperature was, in fact, 95.4 degrees. Dr. Inaba testified, however, that even a body temperature of 95.4 degrees would be quite low and that he had treated children who had been found "floating unresponsive" in the ocean for "a while" who had temperatures of 95 degrees.

Inaba then accompanied Natasha to the Pediatric Intensive Care Unit (PICU), where she was placed in the care of Paula Vanderford, M.D., a pediatric intensivist at KMC and the attending physician in the PICU.

Dr. Vanderford observed that Natasha exhibited "bruises on her forehead," "a small laceration above her right eyebrow," "a small bruise or abrasion on her right cheek," "some crepitus [9] under the skin ... in the left temporal parietal region, so there was a bit of swelling in this region," "abdominal distension," "abrasion on the upper abdomen," "some bruising on the left chest just at the lower edge of the rib cage," "circular burn[s]" on her hands and feet that were consistent with cigarette burns, some "fairly new," and "older" bruises "in the lower thoracic lumbar spine," and various superficial abrasions elsewhere on her body. "Clinically, she appeared to be brain dead."

Natasha was admitted to the PICU at approximately 6:40 p.m. The PICU was unable to record a body temperature for her and immediately attempted to increase her body temperature through the use of a warming blanket, an overhead warmer, and heating the air with which she was being ventilated. After nearly three hours, the PICU was able to record a body temperature of 96.3 degrees Fahrenheit. Dr. Vanderford testified that, based on her examination and the tests that the PICU conducted, which indicated a low blood pH level, low body temperature, elevated liver enzymes, and elevated creatinine, as well as cerebral swelling, in her expert medical opinion, Natasha's injuries occurred several hours prior to her admission to KMC. In addition, she testified that she would not expect a soft object, such as a doughnut, to completely block Natasha's airway if Natasha was capable of a "normal cough and gag." The PICU was unable to revive Natasha, and she was subsequently pronounced dead.

Robert DiMauro, M.D., a pediatric radiologist at KMC who examined Natasha's CAT scan, testified, based on his training and thirty-one years of experience as the chief pediatric radiologist at KMC, and to a rea-

sonable degree of medical certainty, that, in his expert opinion, Natasha's brain swelling had been caused by a deprivation of oxygen to the brain that occurred at least six hours prior to the CAT scan taken at 6:13 p.m., and, more likely, closer to twenty-four hours prior. Indeed, Dr. DiMauro testified that "brain swelling develops very slowly, so it takes hours for the brain to swell" to the extent revealed by Natasha's CAT scan, and, consequently, Martinez's account of when and how the injury to Natasha had occurred was inconsistent with the results of her CAT scan.

Victoria Schneider, M.D., a pediatrician at KMC and the director of its child protection center, testified as an expert witness at trial regarding BCS. Based on her review of Natasha's history and medical records, including the specific injuries observed on her body upon admission and during her autopsy, Dr. Schneider testified that, in her expert opinion and to a reasonable degree of medical certainty, Natasha was a victim of BCS. The burns on Natasha's hands and feet were particularly significant to Dr. Schneider, because "no medical care was sought" and they were "consistent with being cigarette burns." Dr. Schneider opined that the burns on her feet appeared to be one to two weeks old, the burns on her hands were probably inflicted within the past three days, the bruises on her face and torso were most likely "obtained a few days [to a week] before admission," and the bone fracture on her arm was probably seven to ten days old.

Janice Ophoven, M.D., a pediatric pathologist board certified in forensic pathology, also testified as an expert witness regarding BCS. Based on Natasha's medical history, she testified that, in her expert medical opinion, Natasha was "a victim of [BCS] with the final event, the consequence of asphyxia most probably due to suffocation." In addition, she opined that timely medical intervention would "most probably" have saved Natasha's life.

Robert Bart, Jr., M.D., a child neurologist at KMC, a professor of internal medicine and

9. "Crepitation" means, among other things, a "grating sound heard on movement of ends of a

broken bone." *Taber's Encyclopedic Medical Dictionary* 460 (18th ed. 1997).

pediatrics and chief of neurology at the University of Hawaiʻi, John A. Burns School of Medicine, and Natasha's consulting pediatric neurologist, also testified at trial. Based on the tests that he conducted and Natasha's medical history, he expressed his expert medical opinion that there was no reasonable explanation for the cause of the cutoff of oxygen to Natasha's brain other than an "inflicted suffocation."

Neither Faufata nor Martinez testified on their own behalf at trial; the prosecution, however, introduced into evidence videotaped statements, with transcripts, that Faufata and Martinez had made to Honolulu Police Department (HPD) Detectives Kenneth Ikehara and Stephen Dung on April 2, 1994, in which the defendants related the events of March 18, 1999. According to Martinez, on March 14, 1999, he and Faufata had been boyfriend and girlfriend for about one year. Martinez and Faufata were not living together at the time, but Faufata and Natasha had slept at Martinez's home during the nights of March 15, 16, and 17, 1994. Martinez lived in a "shack" behind the house of Daniel Barrionuebo located in Pālolo Valley, City and County of Honolulu. The three had awakened together at approximately 8:30 a.m. and, after eating breakfast, Natasha had played by herself in Martinez's shack until she ate lunch with Faufata at Barrionuebo's house, sometime between 10:00 a.m. and 2:00 p.m. During lunch, Martinez had left the property to pick up some parts for a van that belonged to a friend of Hildegard Barona. He returned around 2:00 p.m. and found Barona playing with Natasha; Martinez worked on the van while Barona continued to play with Natasha. At approximately 3:15 p.m., Faufata returned to the shack and took Natasha into the house in order to bathe her; Martinez continued to work on the van until approximately 4:00 p.m.

After completing his work on the van, Martinez picked Natasha up at the house and took her back to his shack, where she watched cartoons and ate a box of doughnuts that she had brought with her from the house. After less than ten minutes, Natasha began making a burping sound and vomited.

Martinez stated that he immediately turned her over and patted her on the back; he also blew on her nose and sucked a "pile of stuff" out of her nose; finally, he threw water on Natasha in an attempt to wake her up. With no success in reviving Natasha, Martinez was about to take her to the fire station when he saw his friend, Adam Kaiwi, and his son, Kealoha Martinez, approaching. Kaiwi was familiar with cardiopulmonary resuscitation (CPR) and attempted to resuscitate Natasha, to no avail. Consequently, Martinez and Kaiwi drove Natasha to the Pālolo Fire Station.

In his statement to the HPD detectives, Martinez also related that Natasha had fallen out of her bed and off her "three wheeler" during the days prior to her death, but had not sustained serious injuries as a result.[10]

On July 13, 2001, the circuit court, Judge Town presiding, issued its decision finding Faufata and Martinez each guilty of the included offense of reckless manslaughter, in violation of HRS § 707–702(1)(a). The circuit court found, *inter alia*, that

> [t]he credible medical evidence in this case belies [the] anecdotal testimony as to the cause of the injury and the time frames testified to. The damage to the child's brain by hypoxia (loss of air) was such, it had to have occurred at least three hours earlier according to the credible medical testimony and, more likely, many hours earlier . . . . It is clear Natasha did not choke and lose consciousness at 4:30 or 4:45 [p.m.], but suffocated or was suffocated hours before. There was no credible or physical evidence of other means of suffocation such as drowning, hanging, or choking on food other than intentional or accidental smothering by someone. The bottom line is that Natasha's injury was inflicted. What is certainly not clear is who smothered the child or deprived her of air.
>
> . . . .
>
> . . . . [Martinez's] statement and that of Dorothy Faufata were simply not credible nor consistent with the credible medical evidence. The expert testimony taken together with the photographs, medical wor-

---

**10.** Faufata's statement to the police was substantially cumulative of Martinez's.

kups and x-rays in this case demonstrate that this child was a battered child with multiple injuries inflicted over different times. The targeting of this child ultimately and tragically ended in her untimely death.

... Both defendants had from 3:00 [p.m.] or, more likely, much earlier to transport an unconscious and dying Natasha for emergency medical assistance or summon medical care. The question then arises [as to] what criminal liability, if any, attaches. While this Court finds Natasha's injury was inflicted, this court cannot find beyond a reasonable doubt that the evidence supports a murder by commission conviction[,] as there is insufficient evidence as to who specifically suffocated the child given the rather large number of people who had access to Natasha that day during the relevant time frames from 3:00 [p.m.] or earlier. Further[,] there is reasonable doubt[,] given the facts and circumstances[,] that Defendants committed the crime of murder by omission such that they intentionally or knowingly caused her death by failing to seek and obtain timely medical attention.

There is, however, proof beyond a reasonable doubt that both Defendants' failure to seek and obtain medical care constituted the included offense of Manslaughter in that Natasha's injury was inflicted, both defendants were present at the time of the injury, and knew of the injury.... Based upon his statement to the Detectives, [Martinez] was with the child during the time the injury was inflicted and she became unconscious. Based upon the medical evidence[,] some [three] or more hours elapsed before Defendant Martinez acted. A duty of care was imposed upon both Defendant Martinez and Defendant Faufata to seek and obtain timely medical care under the relevant statutes (HRS [§ ] 663–

1.6) and case law (*State v. Cabral,* 8 Haw. App. 506 [810 P.2d 672] (1991))....

On February 20, 2002, the circuit court sentenced Martinez to a ten-year term of incarceration, subject to a mandatory minimum term of three years and four months.[11] Martinez filed a timely notice of appeal on March 15, 2002.

## II. STANDARDS OF REVIEW

### A. Sufficiency Of Evidence

We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Batson,* 73 Haw. 236, 248, 831 P.2d 924, 931, *recon[sideration] denied,* 73 Haw. 625, 834 P.2d 1315 (1992) (citations omitted); *see also State v. Silva,* 75 Haw. 419, [434], 864 P.2d 583, 590 (1993) (citations omitted). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." *Batson,* 73 Haw. at 248–49, 831 P.2d at 931 (citation omitted). *See also Silva,* 75 Haw. at [432], 864 P.2d at 590 (quoting *State v. Matias,* 74 Haw. 197, 207, 840 P.2d 374, 379 (1993) [ (1992) ]); *State v. Aplaca,* 74 Haw. 54, 64–65, 837 P.2d 1298, 1304 (1992) (citations omitted).

11. Faufata received the same sentence on September 19, 2001. Faufata subsequently appealed her judgment of conviction, arguing, *inter alia,* that the circuit court erred (1) in admitting Dr. Schneider's testimony regarding BCS and (2) in denying her motion to dismiss for preindictment delay. *See State v. Faufata,* 101 Hawai'i 256, 265, 66 P.3d 785, 794 (Haw.Ct.App.2003). On March 4, 2003, the Intermediate Court of Appeals (ICA) affirmed Faufata's judgment in a published opinion in which the ICA held, *inter alia,* (1) that "Dr. Schneider's testimony on the [BCS] was relevant to prove that the injuries to Natasha were not accidental and that someone must have intended to harm Natasha" and (2) that "Faufata failed to establish any prejudice to her right to a fair trial" due to preindictment delay. *Id.* at 266, 267, 66 P.3d at 795, 796.

*In Interest of John Doe, Born on January 5, 1976,* 76 Hawai'i 85, 92–93, 869 P.2d 1304, 1311–12 (1994); *see also State v. Valdivia,* 95 Hawai'i 465, 471, 24 P.3d 661, 667 (2001).

### B. *The Admissibility Of Evidence*

■ [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.

*Kealoha v. County of Hawaii,* 74 Haw. 308, 319, 844 P.2d 670, 676, *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993). Where the evidentiary ruling at issue concerns admissibility based upon relevance, under [Hawai'i Rules of Evidence (HRE)] Rules 401 and 402, the proper standard of appellate review is the right/wrong standard. *See State v. Toro,* 77 Hawai'i 340, 347, 884 P.2d 403, 410 (Haw.Ct.App.), *cert. denied,* 77 Hawai'i 489, 889 P.2d 66 (1994).

*State v. Kupihea,* 80 Hawai'i 307, 314, 909 P.2d 1122, 1129, (1996) (some brackets in original and some added).

*State v. Staley,* 91 Hawai'i 275, 281, 982 P.2d 904, 910 (1999) (quoting *Tabieros v. Clark Equip. Co.,* 85 Hawai'i 336, 350–51, 944 P.2d 1279, 1293–94 (1997) (citing *State v. Arceo,* 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996))) (brackets in original); *see also State v. Cordeiro,* 99 Hawai'i 390, 403–04, 56 P.3d 692, 705–06 (2002).

### C. *Preindictment Delay*

■ This court must employ both the "clearly erroneous" and "right/wrong" tests in reviewing the circuit court's denial of a motion to dismiss for preindictment delay. *Cf. State v. Hutch,* 75 Haw. 307, 328–29, 861 P.2d 11, 22 (1993) (discussing the standards of review employed "in deciding an [Hawai'i Rules of Penal Procedure (]HRPP[) Rule] 48(b) motion to dismiss"). The circuit court's findings of fact (FOFs) "are subject to the clearly erroneous standard of review," while its conclusions of law are "freely reviewable pursuant to the 'right/wrong' test." *Id.* at 328–29, 861 P.2d at 22.

### III. *DISCUSSION*

### A. *The Prosecution Adduced Sufficient Evidence To Support Martinez's Conviction Of The Offense Of Manslaughter By Omission.*

■ Martinez argues that the prosecution adduced insufficient evidence to convict him of the offense of manslaughter by omission, in violation of HRS §§ 702–203, 707–702, and 663–1.6(a), *see supra* notes 1, 2, and 3. Specifically, he contends that the prosecution failed to adduce substantial evidence to support the circuit court's findings: (1) that Natasha was unconscious "since approximately 3:00 [p.m. on March 18, 1994,] and probably much earlier"; (2) that Natasha was the victim of a crime; and (3) that (a) Martinez was with Natasha at the time the injury was inflicted and she became unconscious and, therefore, (b) he was aware of the injury and knew that Natasha was the victim of a crime. Consequently, Martinez maintains that there was insufficient evidence (1) that he was subject to a duty to obtain medical care for Natasha prior to the time that he did and (2) that he recklessly caused Natasha's death by consciously disregarding a substantial and unjustifiable risk that his failure to act would cause Natasha's death.

■ Martinez's challenge of the sufficiency of the evidence adduced at his trial amounts to nothing more than self-serving characterization of the trial testimony and a disagreement with the circuit court's assessment of the credibility of the witnesses and the weight of the evidence. First, Martinez contends that, because the circuit court found that "[w]hile KMC records indicated [Natasha's] body temperature was 85.4 degrees [Fahrenheit] upon admission at 5:17 [p.m.], it appears that it was more likely 95.4 degrees [Fahrenheit] and the chart was in error[,]" the prosecution failed to adduce substantial evidence regarding the time of Natasha's injury, inasmuch as some of the medical testimony on the subject, according to Martinez, was based "on incorrect information, to wit, Natasha's core body temperature reading of

85.4 degrees when she was initially admitted into the hospital." But, as noted *supra* in section I, the medical testimony regarding the timing of Natasha's injury was based on a variety of factors in addition to her body temperature; the doctors' assessments were not preconditioned upon a precise body temperature of 85.4 degrees.[12] For example, Dr. DiMauro based his medical opinion regarding the time frame within which Natasha became unconscious solely upon the results of her CAT scan and apparently did not consider her body temperature at all. Martinez maintains that Dr. DiMauro's opinion was "contradicted by Dr. Von Guenthner, Dr. Manoukian and Dr. Hardeman, each of whom [testified for the defense and] explained that [the] onset of brain swelling can occur quickly because a baby's brain swells faster than an adult's brain." But "[i]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact.'" *Doe Parents v. State, Dep't of Educ.*, 100 Hawai'i 34, 58, 58 P.3d 545, 569 (2002) (quoting *In re Jane Doe, Born on June 20, 1995*, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001)).

 Second, Martinez argues that, because the circuit court found that Martinez's account of when Natasha's injury occurred was incredible, there was no substantial evidence to support the circuit court's factual finding that Martinez was with Natasha when the injury occurred and, consequently, that he knew that Natasha was injured and that she was the victim of a crime. Essentially, Martinez contends that, because the circuit court did not find his account of when and how Natasha's injury occurred to be credible, it could not rely on his statement that the injury occurred in his presence. It is well-settled, however, that " 'the [trier of

fact] may accept or reject any witness's testimony in whole or in part.'" *State v. Birdsall*, 88 Hawai'i 1, 9, 960 P.2d 729, 737 (1998) (quoting *State v. Clark*, 83 Hawai'i 289, 303, 926 P.2d 194, 208 (1996)). The circuit court found that, "based upon [Martinez's] statement to the Detectives, he was with the child during the time the injury was inflicted and she became unconscious"; in other words, the circuit court credited Martinez's statement that Natasha's injury occurred in his presence. Nevertheless, the circuit court found that, based on the expert medical testimony, "Natasha's injury was inflicted" and "some [three] or more hours [had] elapsed before ... Martinez acted"—that is, the circuit court rejected Martinez's account of how and when the injury occurred. Accordingly, viewed in the light most favorable to the prosecution, there was sufficient evidence for the circuit court to find that Natasha was in Martinez's presence when her injury occurred and, consequently, that Martinez was aware that Natasha was the victim of a crime.[13]

 Third, Martinez contends that the prosecution failed to adduce substantial evidence that Natasha was the victim of a crime. His argument is, frankly, nonsensical, in light of the substantial medical evidence adduced at trial, as noted *supra* in section I, which indicated that Natasha's injury was *inflicted* and was *not* the result of an accident.

Accordingly, we hold that the prosecution did not fail to adduce sufficient evidence to support Martinez's conviction of manslaughter by omission.

### B. *The Circuit Court Did Not Plainly Err In Admitting Expert Testimony Regarding Battered Child Syndrome.*

 Martinez contends that the expert testimony elicited by the prosecution that

---

**12.** Indeed, Dr. Inaba noted that even a body temperature of 95 degrees was quite low for a perfectly healthy child who had recently lost consciousness. In its decision, the circuit court noted that "95.4 degrees [Fahrenheit] is a very low temperature indicating, together with other medical tests, the child had been unconscious and not breathing for at least three hours and probably much longer." In addition, the circuit court noted that "[a]ll other blood panels and medical tests including X-rays, [CAT] scans, and workups

are consistent with this finding of Natasha being unconscious since approximately 3:00 [p.m.] that day and probably much earlier."

**13.** Indeed, Martinez admits in his opening brief that the prosecution "established that[,] on March 18, 1994, Martinez was with Natasha in the morning before 10:00 a.m., in the afternoon between 2:00 p.m. and 3:15 p.m., and in the late afternoon after 4:15 p.m."

Natasha suffered from BCS was irrelevant as a matter of law and, therefore, inadmissible, because there was no evidence to link Natasha's prior injuries to Martinez. Consequently, he argues that the circuit court plainly erred in permitting the prosecution to elicit the foregoing testimony.

On March 4, 2003, after the parties in the present matter had filed their appellate briefs, the Intermediate Court of Appeals (ICA) affirmed Faufata's judgment in a published opinion. *See State v. Faufata*, 101 Hawai'i 256, 66 P.3d 785 (Haw.Ct.App. 2003).[14] The ICA held, *inter alia*, that the circuit court did not err in admitting the evidence of BCS in the present matter because the evidence "was relevant to prove that the injuries to Natasha were not accidental and that someone must have intended to harm Natasha." *Id.*, at 267, 66 P.3d at 796. Although we agree with the ICA's observation, we feel compelled to elaborate on its *Faufata* analysis in the context of the charges against Martinez.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE Rule 401. "All relevant evidence is admissible.... Evidence which is not relevant is not admissible." HRE Rule 402.

Martinez was charged with murder in the second degree, in violation of HRS §§ 707–701.5 and 702–203, *see supra* notes 2, 4, and 5. Consequently, the prosecution sought to prove that Martinez intentionally or knowingly caused Natasha's death by (a) inflicting physical harm upon her and/or (b) by failing to act—*i.e.*, by failing to obtain medical care for Natasha—notwithstanding a duty to act. In order to establish that Martinez was subject to a duty to act, pursuant to HRS § 663–1.6(a), *see supra* note 3, the prosecution was

required to prove, *inter alia*, that Natasha was the victim of a crime and that Martinez was present at the scene of the crime; otherwise, because Martinez was not Natasha's father, he would have owed no duty to obtain medical care for her.[15] Therefore, evidence that Natasha was a victim of BCS was relevant to show that Natasha's death was not an accident, but was the result of an intentional or knowing criminal act, giving rise to a duty on Martinez's part to obtain medical care for her, pursuant to HRS § 663–1.6(a), regardless of who actually inflicted her fatal injury.

The same is true with respect to the lesser included offense of manslaughter by omission, in violation of HRS §§ 707–702, 702–203, and 663–1.6(a), *see supra* notes 1, 2, and 3, insofar as the prosecution was also required to prove that Natasha's death was not an accident, but was the result of a criminal act, and, consequently, that Martinez was subject to a duty to obtain medical care for her if he was present at the scene of the crime. The only difference between the charged and the lesser included offenses pertains to whether, by failing to act, Martinez intentionally or knowing caused Natasha's death, on the one hand, or recklessly caused her death, on the other. In either case, the prosecution was required to prove that Natasha's injury was caused by *someone's* criminal act, though not necessarily that of Martinez, and that Martinez was present "at the scene of [the] crime." *See* HRS § 663–1.6(a), *supra* note 3.

Martinez urges this court, however, to hold that evidence of BCS was admissible only if the prosecution was able to link the child's prior injuries to Martinez's own misconduct. Martinez relies solely on *State v. Guyette*, 139 N.H. 526, 658 A.2d 1204 (1995), in support of his proposition. In *Guyette*, 658 A.2d at 1207, the New Hampshire Supreme Court held that expert testimony that a child suf-

---

14. Neither party in the present matter sought to file a supplemental brief after the ICA filed its opinion in *Faufata*.

15. By contrast, Faufata had a legal to duty to obtain medical aid for Natasha regardless of the cause of her injury, because Faufata was Natasha's mother. *See State v. Batson*, 73 Haw. 236, 251 n. 8, 831 P.2d 924, 932–33 n. 8 (1992) (HRS

§ 577–7(a) "imposes on parents, *inter alia*, a duty to 'provide, to the best of their abilities, for the ... support ... of their children.' Such support includes reasonably necessary and available medical services." (Quoting *State v. Cabral*, 8 Haw.App. 506, 515, 810 P.2d 672, 677 (1991).)).

fered from BCS was irrelevant in a trial in which the defendant was charged with assaulting the child, "unless the prosecution [could] convince the jury that the defendant [was] the expert's 'someone.'"

■ Martinez's reliance on *Guyette* is unhelpful for two reasons. First, in *Guyette,* the prosecution introduced evidence that the child was a victim of BCS in order specifically to prove that the defendant *himself* assaulted the child, whereas, in the present matter, the prosecution introduced evidence of BCS in order to prove that someone, but not necessarily Martinez, injured Natasha. Second, the holding in *Guyette* is at odds, not only with the basic concept of relevancy,[16] but also, as far as we can determine, with all other jurisdictions, including the United States Supreme Court, that have considered the admissibility of expert testimony regarding BCS. *See, e.g., Estelle v. McGuire,* 502 U.S. 62, 69, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (holding that evidence of BCS is relevant to prove that a child's death "was the result of an intentional act by *someone,* and not an accident[,]" regardless of "whether it was directly linked to [the defendant] or not" (emphasis in original)); *State v. Durfee,* 322 N.W.2d 778, 783 (Minn.1982) (noting that BCS "is intended to indicate only that the child was not injured accidentally and does not constitute an opinion as to whether any particular person injured the child"); *People v. Henson,* 33 N.Y.2d 63, 349 N.Y.S.2d 657, 304 N.E.2d 358, 363 (1973) (noting that BCS "'is not an opinion by the doctor as to whether any particular person has done anything' but, rather, it 'simply indicates' that a child of tender years found with a certain type of injury 'has not suffered those injuries by accidental means'"); *State v. Elliott,* 344 N.C. 242, 475 S.E.2d 202, 215 (1996) ("When offered to show that certain injuries are a

product of child abuse, rather than accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who might have inflicted those injuries" (citations and internal quotation signals omitted)); *State v. Lopez,* 306 S.C. 362, 412 S.E.2d 390, 393 (1991) (holding that BCS is "admissible when given by a properly qualified expert and such testimony may support an inference that the child's injuries were not sustained by accidental means"); *State v. Holland,* 346 N.W.2d 302, 308 (S.D.1984) (holding that evidence that a child was the victim of BCS is admissible "when there is evidence of injuries inflicted upon a child over a span of time, when the nature of the injuries is such as to preclude accidental injury, and when the story given does not explain the injury"); *State v. Tanner,* 675 P.2d 539, 541–45 (Utah 1983) (holding that evidence of BCS, based on an examination of a child's body rather than any prior conduct of defendant, is relevant to prove that the child's injuries were not the result of an accident), *abrogated on other grounds by State v. Doporto,* 935 P.2d 484 (Utah 1997). While the foregoing authority appears to support a broader proposition than is required to dispose of Martinez's appeal—*i.e.,* that evidence that a presently injured child has been a victim of BCS is relevant in a trial in which a defendant himself or herself is charged with injuring the child to prove that the child's injury is not, on the present occasion, accidental, regardless of whether the prosecution is able to link the child's prior injuries directly to the defendant—it also supports the narrower principle, which we now expressly adopt, that evidence of BCS is admissible in a trial in which a defendant is charged with an offense implicating the breach of a legal duty to seek and obtain timely medical treatment for an injured child in order to prove that the child's injury was

---

**16.** The New Hampshire court justified its holding, *inter alia,* by stating that "evidence that [a child] has sustained prior intentional injuries from someone does not tend to prove, in and of itself, that the defendant purposely or intentionally caused [the child's] injury." *Guyette,* 658 A.2d at 1207. If it were necessary for evidence to prove, "in and of itself," that a defendant

committed a charged offense, very little evidence would be admissible. But HRE Rule 401 merely requires that the evidence have "*any* tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Emphasis added.)

not accidental, regardless of whether the prosecution is able to link the child's prior injuries directly to the defendant.[17]

Accordingly, we hold that the circuit court did not plainly err in admitting the foregoing testimony that Natasha was a victim of BCS.

3. *The Circuit Court Did Not Err In Denying Martinez's Motion To Dismiss The Indictment For Preindictment Delay.*

 Martinez contends that the circuit court erred in denying his motion to dismiss his indictment for preindictment delay on the bases (1) that the circuit court failed to state its essential findings on the record in accordance with HRPP Rule 12(e) (2000)[18] and (2) that the prosecution's delay of nearly five and a half years in bringing the indictment should be deemed presumptively prejudicial. We disagree.

In reviewing a constitutional due process claim of prejudice engendered by preindictment delay, "the 'due process inquiry must consider the reasons for the delay in prosecution as well as the prejudice to the accused.'" [*State v.*] *Carvalho*, 79 Hawai'i [165,] 167, 880 P.2d [217,] 219 [ (App.1994) ] (quoting *United States v. Lovasco*, 431 U.S. 783, 790 ... [97 S.Ct. 2044, 52 L.Ed.2d 752] (1977)) (brackets omitted). Therefore, a balancing approach is applied, weighing the "substantial prejudice to the defendant's right to a fair trial" against "the reasons for the delay[.]" *Id.* ..., 880 P.2d at 219-20 (quoting *State v. English*, 61 Haw. 12, 17 n. 8, 17, 18, 594 P.2d 1069, 1073 n.[ 8], 1073 (1978)).

*State v. Crail*, 97 Hawai'i 170, 178, 35 P.3d 197, 205 (2001). If the defendant fails "to establish substantial prejudice to his [or her] right to a fair trial, [however,] there is no

imperative to consider the reasons for prosecutorial delay." *Id.* at 180, 35 P.3d at 207 (quoting *Carvalho*, 79 Hawai'i at 167, 880 P.2d at 219-20 (citing *State v. Weeks*, 137 N.H. 687, 635 A.2d 439, 446 (1993), and *State v. Krinitt*, 251 Mont. 28, 823 P.2d 848, 851 (1991))).

In the present matter, as discussed *supra* in section I, Martinez admitted to the circuit court that he was unable to show any prejudice due to preindictment delay. On appeal, Martinez urges this court to hold that the prosecution's preindictment delay was "presumptively prejudicial," but the only authority that he cites in support of his position is *State v. Nihipali*, 64 Haw. 65, 637 P.2d 407 (1981), which addresses a defendant's right to a *speedy trial* pursuant to the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution (a right that attaches once a defendant has become an "accused") and, consequently, is unhelpful to him in the present matter.

Thus, we do not believe that the circuit court's order denying Martinez's motion to dismiss for preindictment delay, which found that "the reasons for the delay were appropriate and that no substantial prejudice was suffered by [Martinez]," failed to state any essential findings on the record in accordance with HRPP Rule 12(e), inasmuch as (a) Martinez failed to identify any specific prejudice as a result of the delay and, therefore, (b) the circuit court was not required to consider the reason for the prosecutorial delay. Put simply, there were no factual determinations for the circuit court to make, because Martinez advanced no set of facts that would support his motion. For that reason, we hold that the circuit court did not err in denying Martinez's motion to dismiss for preindictment delay.

17. This court need not and therefore does not address the "broader proposition" regarding whether the evidence of BCS would be admissible if Martinez had been charged solely with an act of commission, under circumstances in which the prosecution was unable to link Natasha's prior injuries to him. We note that the ICA could not have addressed the "broader proposi-

tion" in *Faufata* either, because Faufata was only charged with an act of omission.

18. HRPP Rule 12(e) provides in relevant part that, "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."

## IV. CONCLUSION

In light of the foregoing, we affirm the circuit court's judgment of conviction and sentence.