**Electronically Filed
Supreme Court
SCWC-20-0000485
15-MAR-2023
08:07 AM
Dkt. 11 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

In the Interest of DM

SCWC-20-0000485

CERTIORARI FROM THE INTERMEDIATE COURT OF APPEALS
(CAAP-20-0000485; FC-J NO. 0101376)

MARCH 15, 2023

McKENNA, WILSON, AND EDDINS, JJ.;
AND NAKAYAMA, J., DISSENTING, WITH WHOM RECKTENWALD, C.J., JOINS

OPINION OF THE COURT BY EDDINS, J.

A minor stabbed another minor.  The State prosecuted, and the minor, DM, argued self-defense.  The family court rejected his defense.  It ruled the prosecution had proven attempted assault in the first degree beyond a reasonable doubt.

In Hawai'i self-defense cases, the defendant's subjective belief drives an objective reasonableness standard.  Factfinders wear the defendant's headset and experience the event from that

reality.  Then, from that perspective, the judge or jury evaluates the objective reasonableness of the defendant's subjective belief that self-protective force was necessary.

Here the family court inadequately assessed the circumstances from DM's perspective.  The court also misapplied key self-defense elements: the use of deadly force and the duty to retreat.

Substantial evidence does not support DM's adjudication.  We reverse.

**I.**

The State filed a petition that alleged DM violated Hawai'i Revised Statutes (HRS) §§ 705-500 and 707-710, attempted assault in the first degree.[1]  After a bench trial, the family court adjudicated DM as charged.

DM contests the elemental facts.  The factual circumstances are mostly undisputed.

After midnight in June 2019, a large group of 'Ewa Beach teenagers socialized at One'ula Beach Park (Hau Bush) in 'Ewa Beach.  Most drank alcohol.  The interior lights from open car and truck doors lit up the pitch-black area.

---

[1]    A person commits attempted assault in the first degree if the person "intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission" of assault in the first degree, which is committed if the person "intentionally or knowingly causes serious bodily injury to another person."  HRS §§ 705-500 (2014), 707-710 (2014).

2

DM and his cousin heard about the gathering on social media.  The cousin drove to Hau Bush.  DM did not know anyone there.  Soon DM met some girls.  As they talked, a shirtless teen (CW) obtruded.  CW appeared "sketchy," so DM suggested he leave.  CW left.

But soon CW returned.  He harassed a girl who was talking with DM.  CW called her "bitch" and "slut."  DM stood up for her.  Then CW challenged DM to fight.  DM said he didn't want any problems and asked CW to leave.  CW did not leave this time.  CW asked DM where he was from.  DM replied, Kalihi, and the two teens argued.

Then, things got physical.  CW rushed DM.  He punched DM several times.  DM fought back.  CW's friends and others jumped in, pulled CW off DM, and pushed DM away.  CW's friends restrained and tried to reason with him.  But CW didn't listen; he broke from his friends' grasp.

Again, CW rushed and punched DM.  He tackled DM to the ground.  As before, DM fought back.  The two wrestled and punched each other.  Other teens entered the fray.  One of CW's friends said he "grabbed" DM and "walked away with him."  CW's friends pulled him off and away from DM.  They held CW and tried to settle him down.  For unknown reasons, other fights broke out.  Hau Bush had turned "chaotic" and "rowdy."

The crowd closed in.  DM did not see his cousin.  To DM, "the whole 'Ewa Beach" was there.  DM darted to his cousin's car. He got his work knife and faced the crowd, a few feet from the car.  Only about ten to fifteen seconds had gone by since he had been attacked.  Holding his knife, DM warned: "Who like get stab?"

The crowd stopped or backed off, except CW.  Despite his friends' grip, he broke free, yet again.  He launched into the air, tackling DM.  DM never moved from his spot, next to the car.

CW landed atop DM.  He unleashed a flurry of punches.  DM held his arms over his face.  Soon CW rolled off DM.  DM had stabbed CW, once, in the abdomen.  DM got up.  He found his cousin and told him he had "accidentally" stabbed someone.  The cousin quickly drove them away.

DM testified.  He detailed the verbal and physical confrontations with CW.  He described how CW rushed him the second time.  They fought on the ground.  Another teen punched DM in the head.  DM described this attack as being "side-blinded from somebody else."  Then DM recounted, another person hit him: he "got punch[ed] again.  And I was looking.  I was tripping out . . . [c]hoke people was getting nuts."  DM was scared.  "Like had a lot of people.  I was getting whack.  I was outnumbered."

DM dashed to his cousin's car and grabbed his work knife; it had a three to four-inch blade. He hoped the crowd would back off. DM stayed put, near his cousin's car. CW and other teens advanced: "[h]ad more boys coming to rush me." They were ten feet from him. DM warned: "Who like get stab?" DM did not want to hurt anybody. Instead, he wanted to "make them back away." They slowed or backed away, but not CW.

CW yelled "I no give a fuck if you have the knife" and propelled into the air, tackling DM. DM tried to "catch" or "wrap" CW. Then DM was on his back. Astride DM, CW threw several punches before rolling off him. DM had stabbed CW.

DM argued he lacked intent and acted in self-defense.

The family court adjudicated DM as a law violator. The State had proven the elements of attempted assault in the first degree.

The court rejected DM's defense. DM's use of deadly force was not objectively reasonable. DM could not stab CW "under the circumstances."[2]

---

[2] Findings of Fact (FOF) #41 reads:

> 41. While [DM] may have subjectively believed that such deadly force was necessary, the Court does not find that the amount of force used was objectively reasonable under the circumstances of this case, beginning and culminating with getting the knife from the vehicle, coming out of the vehicle instead of staying in the vehicle, making a threatening statement and ultimately resulting in [DM] stabbing [CW].

The court also found that DM's use of deadly force comprised not just the stabbing, but also the steps leading up to it: "retrieving the weapon from the vehicle, coming out of the vehicle with the weapon, making the threatening statement and ultimately using the weapon does constitute deadly force."[3] Further, the court found that DM "could have waited in the vehicle or left the area with complete safety."[4]

DM appealed.  DM challenges the court's self-defense-related findings and conclusions.  And citing State v. Lubong, 77 Hawaiʻi 429, 433, 886 P.2d 766, 770 (App. 1994), DM argues the court did not properly assess the circumstances from his "shoes."

---

[3]     FOF #42 reads:

> 42. The mere brandishing and/or threat to cause death or serious bodily injury by the production of a weapon so long as the actor's intent is limited to creating an apprehension does not in and of itself constitute deadly force.  However, retrieving the weapon from the vehicle, coming out of the vehicle with the weapon, making the threatening statement and ultimately using the weapon does constitute deadly force.

[4]     FOF #37 reads:

> 37. [DM] could have gone to the vehicle and instead of getting the knife, could have extricated himself from the situation if he stayed in the vehicle or he could have left the area but chose not to do so.

Conclusions of Law (COL) #12 reads, in part:

> 12. [DM] left the area to obtain a weapon, the knife, from a vehicle and returned and stated "who like get stabbed." The confrontation was broken up, but [DM] chose to return with the weapon, ultimately stabbing [CW].  [DM] could have waited in the vehicle or left the area with complete safety.

The State counters that the record supports the court's ruling.  It argues the family court properly evaluated the evidence and rejected DM's self-defense claim.

The Intermediate Court of Appeals (ICA) affirmed the family court in a memorandum opinion with a dissent.  The ICA concluded the court did not err, and the State had presented sufficient evidence to establish that DM intended to stab CW without lawful justification.

## II.

We conclude the family court wrongly rejected DM's defense.

The court inadequately assessed DM's conduct from his perspective.

The family court also misapplied key self-defense elements. Because DM's actions before he stabbed CW did not constitute deadly force, the court erred.  Next, the court misapplied the duty to retreat.  Third, there were not separate fights as the court found, but rather one violent event between DM and CW. Lastly, the court overlooked evidence about DM defending himself against multiple attackers.

## A.

The court temporally bumped up the analysis of two central self-defense elements: the use of deadly force and the duty to retreat.  The court's approach, we believe, skewed its subjective and objective analysis.

DM did not use deadly force before he stabbed CW. Thus, the court erred in FOF #42 when it ruled that "retrieving the weapon from the vehicle, coming out of the vehicle with the weapon, making the threatening statement and ultimately using the weapon does constitute deadly force." True, "using the weapon" does constitute deadly force. But DM's other actions do *not* constitute deadly force.

The *use* of deadly force, not actions before a person uses deadly force, constitutes deadly force. Deadly force means "force which the actor *uses* with the intent of causing or which the actor knows to create a substantial risk of causing death or serious bodily harm." HRS § 703-300 (2014) (emphasis added). DM used deadly force at the moment he stabbed CW. Not before. See State v. Pemberton, 71 Haw. 466, 477, 796 P.2d 80, 85 (1990) (focusing on the defendant's perspective "at the time [they] tried to defend [themselves]" with deadly force).

DM's pre-stab conduct did not constitute deadly force for another reason. CW attacked DM. DM did not "provoke[] the use of force against him."[5] So, under the circumstances, DM could

---

[5] No one claimed DM provoked the use of force against himself. HRS § 703-304(5)(a) (2014) reads:

> The use of deadly force is not justifiable under this section if:
> (a) The actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter[.]

produce his knife and threaten the crowd without those actions constituting deadly force. "A threat to cause death or serious bodily injury, by the production of a weapon or otherwise, so long as the actor's intent is limited to creating an apprehension that the actor will use deadly force if necessary, does not constitute deadly force." HRS § 703-300.

The evidence showed DM intended to create apprehension that if necessary, he would use deadly force. CW and others had attacked DM and a crowd was "coming to rush" him. DM felt outnumbered. He did not want to hurt anybody. He just wanted to "make them back away." DM stayed in the same spot, near his cousin's car. And his words: "Who like get stab?" expressed an intent limited to creating an apprehension that he would use deadly force, if necessary.

Contrary to the court's finding, there was no deadly force when DM got his knife and cautioned the crowd.

**B.**

Turning to the duty to retreat, the court misapplied the law there, too.

Hawai'i law does not require a person to retreat before using deadly force. That is, unless the person "*knows* that [they] can avoid the necessity of using such force with complete

safety by retreating."  HRS § 703-304(5)(b) (emphases added).[6]
It's a purely subjective inquiry.

The court gave no consideration to whether DM knew he could retreat with complete safety.  It felt DM should have or could have handled things differently; by, for instance, sitting in his cousin's car, a move DM feels would have made him "a sitting duck."

There was no evidence to support the court's recommended pathways to compete safety.  And there was no evidence presented (or considered by the court) regarding whether DM subjectively knew he could sit in the car or leave the unfamiliar, lightless area with complete safety.  See State v. Augustin, 101 Hawaiʻi 127, 128, 63 P.3d 1097, 1098 (2002) (explaining that a defendant only has knowledge of circumstances when the defendant is "aware" of the circumstances).

The court discounted duty to retreat's purely subjective nature.  The duty to retreat depends on the actor's perspective. The factfinder considers what the defendant knows at the time. "The use of deadly force is not justifiable under this section if . . . [t]he *actor knows* that [they] can avoid the necessity of using such force with complete safety by retreating . . ."

---

[6]    HRS § 703-304(5) provides: "The use of deadly force is not justifiable under this section if . . . [t]he actor knows that [they] can avoid the necessity of using such force with complete safety by retreating . . . ."

HRS § 703-304(5) (emphasis added); State v. Mark, 123 Hawai'i 205, 226, 231 P.3d 478, 499 (2010) (applying the subjective inquiry to the duty to retreat: "[n]othing in this testimony indicates that Petitioner knew that he could avoid the necessity of using deadly force by retreating," and "Petitioner did not testify as to any knowledge he may have had in regard to avoiding the necessity of using force.").

Also, the family court prematurely applied the duty to retreat analysis. DM's acts up until the stab did not constitute deadly force. There was no deadly force used when DM grabbed the knife or when he produced it to scare the crowd. DM didn't have a duty to retreat at those times.[7] The temporal context for the retreat analysis occurs at the moment deadly force is used or becomes imminent. See Matter of Y.K., 663 N.E.2d 313 (N.Y. 1996) (explaining the duty to retreat "d[oes] not arise until the point at which deadly physical force was used or imminent.").

Contrary to the court's finding, the duty to retreat kicked in at the moment CW broke free from his friends and rushed DM. Even if DM could have safely left before that time, he had no

---

[7]    There is no duty to retreat when force is used. But if a person uses deadly force, there is a duty to retreat. To the extent the family court treated DM's "threat" – "Who like get stab?" - as "force" to boost its use of "deadly force" finding, it also erred. "Force" means any "bodily impact . . . or the threat thereof." HRS § 703-300.

11

legal duty to do so - he had not yet used deadly force. HRS §§ 703-300, 703-304(5)(b). Nothing in the record shows that - at the time CW attacked - DM knew he could retreat with complete safety without using deadly force.

### C.

The family court failed to adequately assess and credit DM's perspective in another key way. The court split the event into separate fights.[8] But there were not separate fights between DM and CW. Rather, there was one continuous violent event between DM and CW. The court's multiple-fights finding is clearly erroneous. See In re Doe, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001) (principle that a finding by the family court "is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial

---

[8]    The court's multiple fights findings include COL #12 and FOF numbers 23, 29, 38, 39:

> 23. After the fight was broken up, it was at that point that [DM] went over to a vehicle, the Nissan Altima that his cousin had driven him to Hau Bush in. [DM] retrieved a knife that he used for work. Upon retrieving the knife, [DM] exited the vehicle, and yelled out "who like get stabbed."
>
> 29. After the second altercation, when [DM] extricated himself from the situation, [DM] went to the vehicle, obtained a knife from the vehicle, came back out of the vehicle with the knife, and stated "who like get stabbed." At that point, [CW] charged at [DM].
>
> 38. [DM] was entitled to utilize self-defense in the first altercation.
>
> 39. When the second altercation occurred, [DM] was also entitled to use self-defense, but only such force that was reasonably necessary under the circumstances.

evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.").

The court believed the fight between CW and DM mostly ended, restarted, then ended, before DM stabbed CW in yet another fight. Fights, though, are unpredictable. They often rapidly unfold and evolve. Lulls happen. Danger recedes and surges. A fight's end is sometimes murky.

Only about 10-15 seconds passed between DM rising from the ground and facing the crowd with his knife. Before then, CW had escaped his friends' hold and attacked DM. Others also attacked him, DM believed. And before that, CW attacked DM - after DM aided a girl who CW had vulgarly harassed.

To DM, there were no rounds, no multiple fights, just one continuous event. The family court did not adequately consider DM's perspective.

**D.**

The court disregarded DM's perspective relating to another self-defense feature. DM believed he faced peril from multiple attackers. Since DM used deadly force, which the court deemed objectively unreasonable, this mattered. See State v. DeLeon, 143 Hawai'i 208, 218, 426 P.3d 432, 442 (2018) (stating that a person who faces other attackers presents "an exception to the

general rule that a claim of self-defense fails when deadly force is used to stop a simple assault.").

DM believed that others besides CW had attacked him.  As he fought with CW, someone else punched him in the head.  Then, another person landed a punch.  DM was getting "whacked."[9]  This happened right before DM darted to his cousin's nearby car.

The family court ignored, or at least severely undervalued, DM's experiences and point of view at the moment he used deadly force.  CW had attacked DM more than once.  Others also assaulted him.[10]  People were rowdy, going nuts in the pitch-black area.  DM wasn't from there.  He felt outnumbered.  DM thought the 'Ewa Beach crowd was about to rush him.

The court failed to consider DM's belief that deadly force was necessary to protect himself from serious physical harm by

---

[9]     The family court did not find that DM's testimony in this respect lacked veracity:

> 36. [DM] claimed he was assaulted not only by [CW] but that somebody else had struck him, which then caused him to extricate himself from the situation and go to the vehicle.

The court made *one* finding that DM's testimony was not credible:

> 27. [DM] testified that the stab was an accident, and that he was trying to hug and/or catch [CW].  The Court does not find that to be credible testimony.  The Court finds that [DM] did in fact stab, and did intend to stab the complaining witness with the knife that was produced.

[10]    There was evidence to support DM's fear from other attackers.  CW's friend got physical with DM.  He testified that he "grabbed" DM and "walked away with him."

14

more than one attacker.[11]  DeLeon, 143 Hawai'i at 218, 426 P.3d at 442.

### III.

A subjective and objective inquiry guides Hawai'i's self-defense law.  In self-D cases, the factfinder's decision pivots on the objective reasonableness of the defendant's subjective belief about the need to use force or deadly force.[12]  State v. Culkin, 97 Hawai'i 206, 217, 35 P.3d 233, 244 (2001).

The family court concluded that DM "*may have subjectively believed*" deadly force was necessary.  Then the court skipped to the objective analysis:

> 41. While [DM] may have subjectively believed that such deadly force was necessary, the Court does not find that the amount of force used was objectively reasonable under the circumstances of this case, beginning and culminating with getting the knife from the vehicle, coming out of the vehicle instead of staying in the vehicle, making a threatening statement and ultimately resulting in [DM] stabbing [CW].

We conclude that the family court inadequately considered DM's perspective.  It found that DM's subjective belief was objectively unreasonable without appraising DM's point of view.

---

[11]    Defendants may use deadly force if they believe it is necessary to protect themselves against death or serious bodily injury.  HRS § 703-304(2). "'Serious bodily injury' means: bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."  HRS § 707-700 (2014 & Supp. 2019).

[12]    This case involves deadly force.  DM concedes he used deadly force when he stabbed CW with a knife.  Deadly force means "force which the actor uses with the intent of causing or which the actor knows to create a substantial risk of causing death or serious bodily harm."  HRS § 703-300.

The court shortchanged DM's perspective.  And this tilted its objective analysis.

HRS § 703-304(2) describes the subjective part.  The use of deadly force in self-protection is justified "if the actor believes that deadly force is necessary to protect [themselves] against death, serious bodily injury, kidnapping, rape, or forcible sodomy."[13]

HRS § 703-300 brings the objective part.  It defines "believes" as "reasonably believes."

Once the type of force is determined, a two-step inquiry happens.  In deadly force cases, the factfinder first decides whether the defendant subjectively believed that deadly force was necessary.  Then, if so, the judge or jury decides whether that belief was objectively reasonable.  But how?

The defendant's perspective provides the evidentiary scope for the objective analysis.  The defendant's sensory and pre-deadly force experiences control the factfinder's objective evaluation.  See Pemberton, 71 Haw. at 477, 796 P.2d at 85

---

[13] Compare HRS § 703-304(1) regarding the use of non-deadly force ("the use of force . . . is justifiable when the actor believes that such force is *immediately necessary* for the purpose of protecting [themselves] against the use of unlawful force by the other person on the present occasion") (emphasis added) with HRS § 703-304(2) regarding deadly force ("the use of deadly force is justifiable . . . if the actor believes that deadly force is *necessary* to protect [themselves] against death, serious bodily injury, [etc.]") (emphasis added).

Hawaiʻi Standard Jury Instructions, Criminal (HAWJIC) 7.01A misstates HRS § 703-304(2).  For deadly force cases, it adds the adverb "immediately."

(principal that "the standard for judging the reasonableness of a defendant's belief for the need to use deadly force is determined from the point of view of a reasonable person in the Defendant's position *under the circumstances as [they] believed them to be*."); Lubong, 77 Hawai'i at 433, 886 P.2d at 770 (explaining that "[i]n evaluating the reasonableness of a defendant's belief that deadly force was necessary for self-protection, the evidence must be assessed from the standpoint of a reasonable person in the defendant's position under the circumstances as the defendant subjectively believed them to be at the time [they] tried to defend [themselves].").

The court bypassed DM's perspective of the event. There were not separate, divisible fights, as the court believed. And CW did not pose the only danger to DM. Also, temporally, the court incorrectly advanced DM's use of deadly force, as well as DM's duty to retreat. Further, the court overlooked DM's subjective belief that he could not retreat with complete safety. These analytical flaws, we conclude, improperly impacted the court's objective analysis.

A defendant's circumstances - what they think, see, hear, touch, smell, and (sometimes even) taste - frame the objective inquiry. Because the defendant's subjective belief shapes the objective standard, the judge or jury wears the defendant's headset and enters the defendant's reality. See Lubong, 77

17

Hawai'i at 433, 886 P.2d at 770 (instructing that "[t]he factfinder is required to place itself in the shoes of the defendant, determine the point of view which the defendant had at the time of the incident, and view the conduct of the victim with all its pertinent sidelights as the defendant was warranted in viewing it.") (Cleaned up.)

We are unconvinced that the family court satisfactorily assessed DM's perspective.  CW attacked DM, more than once.  Someone else punched DM in the head.  And DM thought another teen also hit him.  The chaotic crowd in the unfamiliar, darkened area scared DM.  They were nuts.  DM believed the fight with CW had dangerously ripened.  He thought others endangered him; DM felt outnumbered.  "The whole 'Ewa Beach" was there.

DM got the knife to make the crowd withdraw.  Yet, after DM retrieved the knife, CW and others still advanced.  DM recalled: "had more boys coming to rush me."  They were close, ten feet away.  DM stayed put.  Only seconds had passed since CW and others had struck him while he was on the ground.  DM warned: "Who like get stab?"  He didn't want to hurt anybody, he said.  DM just wanted to "make them back away."  It didn't work.  CW rushed, tackled, and punched DM.  DM stabbed him, once.

We conclude that the family court inadequately assessed the circumstances from DM's perspective.  The court's slight treatment of DM's subjective beliefs and the court's errors

18

relating to the use of deadly force and the duty to retreat, marred the court's objective analysis.

Under the circumstances of this case, we find that there was not substantial evidence presented to support the family court's conclusion that the State proved beyond a reasonable doubt that DM's use of deadly force was unjustified.[14]

### IV.

We vacate the ICA's Judgment on Appeal.  We reverse the Family Court of the First Circuit's Order Re: Motion for Reconsideration of Order Adjudicating DM of Attempted Assault in the First Degree and Restitution Filed October 29, 2019 and the Findings of Fact and Conclusions of Law entered by the family court on July 24, 2020.

| | |
|---|---|
| Phyllis J. Hironaka<br>for petitioner | /s/ Sabrina S. McKenna |
| | /s/ Michael D. Wilson |
| Loren Thomas<br>for respondent | /s/ Todd W. Eddins |



---

[14]    As we explained in State v. Martinez:

> We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury.  The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

101 Hawai'i 332, 338, 68 P.3d 606, 612 (2003) (cleaned up).